**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:24-cr-00004 (RDM)** |
| **v.** | : | |
| | : | |
| **PAUL CALOIA,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Paul Caloia has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Caloia to 45 days' incarceration on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.      Introduction

Defendant Paul Caloia participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Caloia pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building). The government's recommendation, including a period of incarceration, is supported by (1) Caloia's choice to enter the Capitol building after seeing teargas deployed; (2) the fact that Caloia was among the first rioters to enter the Capitol building, and that he entered through a broken window; (3) Caloia's presence in multiple sensitive areas of the Capitol building, including the Spouses' Lounge, the area near the entrance to the floor of the House of Representatives, and a room utilized by the Senate Appropriations Committee; (4) the fact that Caloia deleted evidence immediately following January 6; (5) Caloia's criminal history and prior disrespect for the law; and (6) the need for specific and general deterrence from future crimes.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Caloia's crime support a sentence of 45 days' incarceration and 36 months' probation.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 25 (statement of offense).

### *Defendant Paul Caloia's 's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Caloia traveled to Washington, D.C. from Michigan, where he resides, with three other individuals. On the morning of January 6, Caloia went to the Ellipse where he listened to the entirety of former President Trump's speech. He then went to the Capitol building, approaching the building from the West side. Tear gas or another chemical irritant was deployed nearby as he walked towards to the building, as shown in the image below. *See* Image 1. Caloia nonetheless weaved through the crowd and continued towards the building.



*Image 1: Open-Source Footage Depicting Caloia Walking Towards the Capitol Building*

Caloia ascended the Northwest Steps of the Capitol building, towards the Upper West Terrace, along with members of the mob. Video footage demonstrates that Caloia observed the mob as he walked up those steps, *see* Image 2, and that he walked past bike rack barricades that had been knocked over. *See* Sentencing Exhibit 1 at 0:40. As Caloia walked up the steps, people in the crowd yelled things like "Whose fucking house is this?" Sentencing Exhibit 2 at 0:21 (footage recorded by Caloia).



*Image 2: Screenshot from Sentencing Exhibit 1 at 00:36 Depicting Caloia in the Crowd on the Northwest Steps of the Capitol Building*

Caloia entered the building through a broken window near the Senate Wing Door at approximately 2:22 p.m., approximately ten minutes after those doors and windows were first breached, and remained in the building for nearly forty minutes. Caloia was part of the first wave of rioters that breached the restricted grounds, entered the Capitol building, and forced Congress into recess.[2] Footage from January 6 indicates that alarms blared in the background as Caloia entered the building.  Immediately before he entered the building, Caloia recorded a video in which

---

[2] The Senate gaveled into recess at approximately 2:13 p.m. and the House of Representatives gaveled into recess at approximately 2:18 p.m., mere minutes before Caloia entered the building.

he said, "we're literally storming the Capitol building right now. We're just going inside, we're just going inside baby." Sentencing Exhibit 3. He then pointed out that "the windows are busted." *Id*. at approximately 00:19.



*Image 3: Caloia Entering the Capitol Building Through a Broken Window*

After entering the building, Caloia turned South and entered S-145, a room near the Senate Wing Door that is not sometimes referred to as the "Spouses' Lounge," and that is not typically open to the public, shown below. As he entered that room, he said, "people are just fucking taking over." Sentencing Exhibit 3 at approximately 1:19 to 1:38.



*Image 4: Caloia Exiting a Private Room, S-145, Near the Senate Wing Doors*

After exiting that room, Caloia pushed through the Crypt with a crowd of people as the crowd chanted, "stop the steal" and "whose house? Our house," among other things. *See, e.g.*, Sentencing Exhibit 4 at approximately 0:49 (showing Caloia exiting the room shown in Image 4 as the crowd chanted). Caloia was in the vicinity as officers became engulfed by the increasingly aggressive crowd. *See* Sentencing Exhibit 5 at 20:24 to 21:00.



*Image 5: Still Screenshot from Sentencing Exhibit 5 at 20:40 Showing Caloia in the Crowd in the Crypt of the Capitol Building*

As he exited the Crypt, some rioters in Caloia's vicinity banged on walls and yelled "1776"." *See* Sentencing Exhibit 5 at 21:45. Caloia recorded on his phone as he moved with the crowd through the building:



*Image 6: Still Screenshot from Sentencing Exhibit 5 at 22:05 Showing Caloia Recording on his Phone as He Moved Through the Capitol Building with the Crowd*

Caloia and the crowd encountered several officers attempting to prevent the mob of people from moving forward, as shown in the below screenshot from footage recorded by Caloia. Sentencing Exhibit 6. The crowd pushed past those officers.



*Image 7: Still Screenshot from Sentencing Exhibit 6 at 00:06 showing Officers Facing Mob of Rioters*

Caloia continued walking South, again chanting along with a mob of people as he marched through the Capitol. Caloia proceeded upstairs, where he entered several additional areas of the Capitol building, including but not limited to Statuary Hall:



*Image 8: Caloia Walking Through Statuary Hall*

Caloia joined a crowd of people who chanted "stop the steal" and "break it down" near the entrance to the floor of the House of Representatives.[3] Members of that crowd also yelled things like "go," and "open it." Caloia stood a few rows back, but within eyesight, from the individuals directly in front of those doors. *See* Sentencing Exhibits 7, 8, and 9.

---

[3] Because Caloia was wearing a mask at this time, it is not clear from the footage whether he joined in these chants or not.



*Image 9: Screenshot from Sentencing Exhibit 7 at 0:40, Showing Caloia Near the Door to the House Chamber*

The screenshot below is from a video that Caloia recorded in this area. Sentencing Exhibit 9. In that video, Caloia says, "Yeah, so I mean, this is insane…What if you get in to where they're literally, actually sitting? Do you think these people want to physically actually stop them from [inaudible]?" Sentencing Exhibit 9 starting at approximately 00:45.



*Image 10: Screenshot from Sentencing Exhibit 9 at 0:08 Showing the Crowd Near the Door to the House Chamber*

After leaving that area, Caloia ascended the stairs to the third floor of the Capitol building. He entered a room on the Southwest side of the building, used by the Senate Appropriations Committee, at approximately 2:46 p.m. Caloia recorded as individuals drank beer in that room. He

exclaimed, "Corona on the U.S. government, our tax dollars pay for that, yeah?" then began chanting, "whose beer? Our beer."  Sentencing Exhibit 10. Police entered the room and attempted to clear that area. Caloia recorded a video in which he stated, "they came in with like guns and shit, like ARs, and they have me face down on the ground. They're like securing this room…I would leave, but they have to secure the building and I'm just in the wrong room dude. Wrong room at the wrong time." *See* Sentencing Exhibit 11. At this point, Caloia had been in the Capitol building for nearly thirty minutes.

Caloia exited the building with his hands in the air at approximately 2:59 p.m., after being cleared by the police.  In total, he was in the building for approximately 37 minutes.

Once outside of the building, Caloia recorded a video in which he celebrated with another individual, calling him a "fucking hero," and saying, "we had Corona beers and they came in with rifles and took us down, and kicked us out!" Sentencing Exhibit 12 at 00:32 to 00:51. Caloia then joined a crowd as they chanted, "fuck Joe Biden" and "1776." *See* Sentencing Exhibit 13 (showing Caloia at approximately 0:08). He remained on the West side of the building, within restricted Capitol grounds, for at least thirty-five minutes after exiting the building, including as police officers attempted to clear the Upper West Terrace and as rioters violently engaged with those officers. *See* Exhibit 14 at approximately 24:34 (showing Caloia on the Upper West Terrace of the Capitol building). Footage filmed by Caloia indicates that he then went over to the East Front of the building, also within restricted grounds, where he stated, "We got tear gassed. We had ARs pointed at us. They searched me and let me go, dude…I'm go grateful they had more important things to do than try to give me some charges, man."  *See* Exhibit 15.

Later that night, Caloia apparently attended or planned to attend an "AFTER PARTY" at a hotel room in Arlington, Virginia, according to records retrieved from his cell phone.

*Caloia's Deletion of Evidence on his Devices*

Footage from January 6, 2021 showed that Caloia used his cell phone to record videos and take pictures throughout the day on January 6. But when the FBI seized and searched Caloia's cell phone, there were no photographs or videos from January 6. Data retrieved from the phone indicated that he wiped his phone via "factory reset" on August 19, 2021, and restored the phone using the "iCloud Backup" feature that same day. As described in more detail below, Caloia admitted that shortly after January 6, he deleted relevant material from his cell phone and other devices because he was concerned he would find himself in legal trouble because of his actions on January 6.  Videos and photographs were found on the defendant's desktop iMac computer, seized from his home, despite his efforts to delete relevant evidence. Select videos are included as Sentencing Exhibits 2, 3, 6, 9, 10, 12, and 15.

*Interview of Caloia*

On September 10, 2024, Caloia agreed to an interview pursuant to his plea agreement with the government. During that interview, Caloia insisted that he saw no violence on January 6, and further insisted that he did not see any barriers knocked down, despite the fact that he walked across the West Lawn of the Capitol building, where multiple violent interactions with officers occurred, and that he walked directly past bike rack barricades on the Upper Northwest Terrace. He stated that he even though he saw tear gas, he continued towards the Capitol because he was curious, and because it did not appear to him that officers were attempting to clear rioters or telling people to leave.

Although the evidence shows that Caloia entered the building through a broken window as alarms blared, Caloia further said that he did not hear alarms as he entered the building. Caloia traveled through the building for nearly forty minutes, entering multiple different floors of the

building, but stated that he did not realize that he was not supposed to be in the building until one of the rooms that he was in was cleared by officers. *See* Sentencing Exhibit 11, and page 13, above.

Caloia expressed some remorse for his actions on January 6, 2021. Caloia claimed that, after leaving the Capitol, he met back up with the group that he travelled with and watched the news, despite the note in his phone referencing a "party." He stated that he nearly immediately believed that he was in trouble and was shocked that the participants in the events at the Capitol were being labeled "terrorists." Looking back, he said that he wishes he was not involved in the events of that day and wishes that he did not enter the Capitol building. During that same interview, Caloia stated that he nearly immediately deleted all evidence of his involvement on January 6, 2021 from his phone because he was "freaking out" and "felt hunted down," and that he also attempted to delete relevant material off of his computer. He also stated that he deleted his social media accounts following January 6, 2021.

*The Charges and Plea Agreement*

On January 3, 2024, the United States charged Caloia by a four-count information with violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 27, 2024, pursuant to a plea agreement, Caloia pleaded guilty to Counts 3 and 4 of the Information, charging him with violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

**III.     Statutory Penalties**

Caloia now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, on each count the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under

the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days' incarceration and 36 months' probation.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Caloia's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Caloia, the absence of violent or destructive acts is not a mitigating factor. Had Caloia engaged in such conduct, he would have faced additional criminal charges.

Although Caloia did not engage in violent or destructive behavior on January 6, he had ample opportunity that day to recognize the wrongfulness of his actions and correct course. Caloia entered the building within the first wave of rioters through a broken window, after seeing teargas deployed outside. He entered three floors of the Capitol building and remained in the building for nearly forty minutes, including by joining a mob near the entrance to the floor of the House of

Representatives, as members of Congress barricaded themselves and took shelter. To this day, he claims that he did not know that he was not supposed to be in the building until he was cleared from a room by police wearing full tactical gear.

Accordingly, the nature and the circumstances of this offense establish the need for incarceration in this case.

### B. Caloia's History and Characteristics

As set forth in the PSR, Paul Caloia's criminal history consists of a conviction for Possession of Marijuana and a conviction for Operating While Visibly Impaired. PSR ¶¶ 35, 36.

The PSR further reflects that Caloia comes from a stable, supportive background. He reported that his childhood was "awesome, normal, and casual," and that his family is close. PSR ¶ 46. According to the PSR, the defendant does not suffer from any mental health conditions. *Id.* at ¶ 55. The defendant further has a high school education and a GED. *Id.* at ¶¶ 59, 60. The government considers these circumstances aggravating: given his background, the defendant should have known and understood the wrongfulness of his conduct on January 6.

The defendant reported to Probation that he was self-employed as a hypnotherapist since 2019. *See* PSR ¶ 64. Caloia did not provide the Probation Office with the name of his business. *Id.* The FBI's investigation in this case also revealed that Caloia earned income off of his position as an internet pornography personality as of the time of his arrest.

Notably, as of the time of this memorandum, it appears that Caloia has since deleted his social media pages associated with the "Cash God Hypnotic" personality. For example, his Twitter page no longer exists. Caloia stated during the September 10, 2024 interview that he deleted these pages immediately after January 6, but prior investigation demonstrated that they remained active as of the time of his arrest.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. This was not a protest but a violent siege of the

18

Capitol. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights"). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration.

First, as discussed above, Caloia's prior arrests and convictions indicate a potential pattern of disrespect for the law. *See* Section IV(B), *supra.*

Second, although Caloia accepted responsibility by stipulating to all of the facts in the Statement of Offense, ECF No. 25, his expressions of remorse came at the last minute, and only when his sentencing hearing loomed ahead of him. The Court should therefore view these expressions of remorse, as well as any remorse Caloia expresses at sentencing, with skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Caloia in a manner sufficient to deter him specifically, and

others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4] This Court must sentence Caloia based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Caloia has pleaded guilty to Counts 3 and 4 of the Information, charging him with violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012); *see United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, this Court and multiple other judges of this court have sentenced defendants who have pleaded guilty to the same charges that Caloia pleaded to here, and under similar circumstances.

In *Untied States v. Fiol*, the defendant was sentenced to 45 days' incarceration and 24 months of probation after the defendant pleaded guilty to charges under 40 U.S.C. §§ 5104(e)(2)(D) and (G), as here. Case No. 1:23-CR-00196 (RCL). Fiol, like Caloia, saw teargas

before entering the Capitol building and, once inside the building, entered sensitive areas of the building, including the Spouses' Lounge, a room which Caloia entered. Fiol smoked in one of those rooms and bragged about his conduct following January 6. Caloia, on the other hand, entered additional sensitive areas of the Capitol building, including the room utilized by the Senate Appropriations Committee. He also remained in the building for a significantly longer amount of time than Fiol, who left building after approximately 25 minutes (compared to Caloia's approximately 37 minutes in the building).

Brent Holdridge was sentenced to 60 days' incarceration and 36 months' probation after he pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G). Case No. 1:21-CR-00729 (RBW). Holdridge was only in the building for approximately five minutes, compared to Caloia's nearly forty minutes. Like Caloia, he entered the building after encountering multiple signs indicating that the building was off-limits, and entered sensitive areas of the building, including the Parlimentarian's Office. Holdridge further had significant criminal history.

In *United States v. Anthony Mazzio*, Case No. 1:22-CR-00214 (RCL), the Court sentenced the defendant to 60 days' incarceration and 36 months' probation. In that case, Mazzio also saw signs he shouldn't enter the Capitol (including tear gas and rubber bullets), yet came inside anyway, as did Caloia. Also like Caloia, Mazzio entered the building through the Senate Wing Door and went into a sensitive area of the Capitol, in Mazzio's case Speaker Pelosi's office. Mazzio remained in the Capitol building approximately one hour and expressed a complete lack of remorse following January 6, 2021.

Nolan Kidd was sentenced to 45 days' incarceration after pleading to similar conduct. Like Caloia, Kidd filmed the riot and chanted with the crowd. Case No. 1:21-CR-00429 (CRC). Kidd entered the building through the Senate Wing Doors despite observing police use tear gas to try

and disperse the crowd, like Caloia. Further, both spent a similar amount of time in the Capitol (Kidd remained for 40 minutes to Caloia's 37 minutes). Kidd did not express remorse in speaking with the FBI after his arrest, whereas Caloia initially refused to speak with the FBI, and only agreed to an interview after entering into a plea deal with the government.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Caloia must pay $500 in restitution, which reflects in part the

role Caloia played in the riot on January 6.[6] PSR ¶ 78. As the plea agreement reflects, the riot at

the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based

on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of

July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by

the Architect of the Capitol, USCP, and MPD.) Caloia's restitution payment must be made to the

Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim

entities. *See* PSR ¶ 95.

## VI.     Fine

The defendant's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G) subject

him to a statutory maximum fine of $5,000.00. *See* 18 U.S.C. § 3571(b). In determining whether

to impose a fine, the sentencing court should consider the defendant's income, earning capacity,

---

against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

and financial resources. *See* 18 U.S.C. § 3572(a)(1).  Here, Probation concluded, based on Caloia's reported financial information, that he has the ability to pay a "nominal" fine, in addition to his restitution obligation. PSR ¶ 75.  Probation further notes that community service may be imposed in lieu of a fine. *Id*. The government agrees.

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, and thus the Court has the authority to impose a fine.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration on Count Three, 36 months' probation on Count Four, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Caloia's liberty as a consequence of his behavior.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Rachel Freeh*
RACHEL FREEH
Assistant United States Attorney
District of Columbia Bar No. 1736082
601 D Street NW
Washington, D.C. 20530

</div>

(202) 252-7749
Rachel.freeh@usdoj.gov